# EXHIBIT "2"

## AMENDED AND RESTATED LOAN AGREEMENT

By this private instrument of amended and restated loan agreement (this "Agreement"),

on the one side, hereinafter referred to as "LENDER",

I- CAT AEREA LLC, a limited liability company organized in accordance with the laws of the State of Delaware, USA, with its registered office c/o National Corporate Research, Ltd., 615 South DuPont Highway, Dover, Delaware 19901, USA, enrolled with the Brazilian General Registry of Corporate Taxpayers of the Ministry of Finance ("CNPJ/MF") under No. 82.691.49/0001-82, herein represented in accordance with its by-laws;

and, on the other side, hereinafter referred to as "BORROWER", and together with LENDER, the "Parties",

II- AÉREO TRANSPORTES AÉREOS S.A. (to be known as VRG LINHAS AEREAS S.A.), a corporation organized in accordance with the laws of Brasil, with head offices at Rua Visconde de Inhaúma, 77, 10th floor, part, in the City and State of Rio de Janeiro, registered as a tax payer under CNPJ/MF No. 07.575.651/0001-59, herein represented by its Officers, in accordance with its by-laws Mr. Jorge Marcio Gomes da Silva, Brazilian citizen, married, bearer of Identity Card No. 04.041.800-6 , issued by IFP/RJ, and registered as taxpayer under CPF/MF No. 487.567.337-04 and Mr. Edson Arruda de Faria e Albuquerque, a Brazilian citizen, divorced, bearer of identity card RG No. 03.926.945-1 IFP/RJ and registered as taxpayer under CPF/MF No. 412.273.877-68;

and, as assignor and acknowledging party, hereinafter referred to as "VOLO"

III. VOLO LOGISTICS LLC, a limited liability company organized in accordance with the laws of the State of Delaware, USA, with its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, USA, registered as a tax payer under CNPJ n° 07.619.064/0001-14, represented in accordance with its by-laws by Mr. Larry Teitelbaum, an American citizen, married, bearer of American passport No. 209160209;



## RECITALS

WHEREAS, the BORROWER and VOLO, a limited liability company organized under the laws of Delaware, USA (the "Existing Lender") are parties to a loan agreement dated as of July 21, 2006 (the "Existing Loan Agreement");

WHEREAS, the BORROWER and VOLO have requested that (i) the LENDER assume the obligations of the Existing Lender under the Existing Loan Agreement, and (ii) the LENDER amend and restate the Existing Loan Agreement to provide for such amendments on the terms set forth in this Agreement;

10222949.7

WHEREAS, it is the intent of the Parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Existing Loan Agreement or evidence payment of all or any of such obligations and liabilities, this Agreement amend and restate in its entirety the Existing Loan Agreement, and that from and after the date hereof, the Existing Loan Agreement be of no further force or effect except as to evidence the incurrence of the obligations of the parties thereto thereunder and the representations and warranties made thereunder;

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the Parties hereto agree that the Existing Loan Agreement shall be amended and restated as follows:

## DEFINITIONS

For purposes of this Agreement the following terms shall have the meanings set forth:

*Edital* shall mean that certain Edital - Boletim No. 127 da Comarca da Capital do Rio de Janeiro 8a. Vara Empresarial dated as of July 13, 2006, in the form published on July 14, 2006 in the Official Gazette.

*Event of Default* shall have the meaning set forth in Clause Five hereto.

*Indebtedness* means (i) the principal, premium (if any), interest and related fees and expenses (if any) in respect of (A) indebtedness for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments, (ii) all obligations in respect of outstanding letters of credit, acceptances and similar obligations, (iii) that portion of obligations with respect to capital leases not entered into in the ordinary course of business and properly accounted for as a liability, (iv) any obligation owed for all or any part of the deferred purchase price of property or services except for trade liabilities incurred in the ordinary course of business in accordance with customary practices, and (v) a guaranty of any of the obligations described in clause (i) or (ii) of this definition.

*Material Adverse Effect* means a material adverse effect on any of (i) the business, financial condition or results of operation of BORROWER and its subsidiaries, (ii) the ability of BORROWER to perform in any material respect its obligations under this Agreement, (iii) the legality, validity or enforceability of this Agreement, or (iv) the rights and remedies of LENDER under this Agreement.

*Person* means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

*PRJ* shall mean that certain Plano de Recuperação Judicial da Varig, S.A., Rio Sul Linhas Aéreas, S.A., Nordeste Linhas Aéreas S.A., dated as of July 17, 2006.

*PRJ Documents* shall mean, collectively, the Edital, the PRJ and the Proposal.

*Proposal* shall mean that certain proposal by Varig Logística S.A. to purchase an Unidade Produtiva from Varig S.A., Rio Sul Linhas Aéreas S.A. and Nordeste Linhas Aéreas S.A. dated as of July 05, 2006, as amended.

*Sale of BORROWER* shall mean (a) the admission of any ON A Shares, ON B Shares of

PN Shares, as legally permissible, to trading on any regulated investment exchange, (b) the sale of all or substantially all of the ON A Shares, ON B Shares or the loans made by Varig Logistica S.A. to purchase ON A Shares and ON B Shares (other than a sale to a wholly owned affiliate or an affiliate controlled through majority shareholdings), or (c) the disposal in one or more transactions of all or substantially all of the assets or operations owned by BORROWER.

*Term* shall mean the period ending on July 20, 2011, provided that if a Sale of BORROWER shall not have occurred prior to such date, the Term shall be automatically extended for successive one year periods, subject to the terms and conditions hereof.

### CLAUSE ONE

The LENDER loaned to the BORROWER the amount of US$ 29,700,000.00 (Twenty Nine Million and Seven Hundred Thousand United States Dollars) in accordance with the provisions of Law no 4.131/62 and the rules issued by the Brazilian Central Bank (the "Loan").

### CLAUSE TWO

The repayment of the Loan shall be made by the BORROWER to the LENDER's account in lawful money of the United States in immediately available funds, no later than 11 a.m. local time at the place of payment, in accordance with instructions to be provided by the LENDER to the BORROWER specifically for this purpose, in accordance with the terms provided for in Clause Three below.

FIRST PARAGRAPH: In the event a payment hereunder is due on a non-banking day in Rio de Janeiro or New York it shall instead fall due on the next following banking day, and such extension of time shall in such case be included in the computation of interest payable hereunder.

SECOND PARAGRAPH: Prior to the execution of this Agreement, the BORROWER shall have carried out the specific registration in the RDE-ROF Module of the financial terms and conditions of this Loan in accordance with the terms of the Central Bank of Brazil's Circular 3,027, dated as of February 22, 2001 as amended.

### CLAUSE THREE

The total amount of the Loan will be repaid on the date that is the earlier to occur of (a) the expiration of the Term, and (b) the occurrence of a Sale of BORROWER (any such date, the "Repayment Date"), to be remitted by the BORROWER to the LENDER in accordance with the legislation and the procedures in force, especially those established by the Brazilian Central Bank, by means of deposit in, or wire transfer to, such bank account as shall be designated by LENDER to BORROWER in writing:

FIRST PARAGRAPH: The principal amount unpaid and outstanding hereunder shall bear interest from the date hereof until paid in full, at the fixed rate of one per cent (1%) per

annum (the "Interest Rate"). Interest at such rate shall accrue and be calculated on the basis of the actual number of days elapsed in a year of 360 days, and shall be payable together with the amount of principal of the Loan.

SECOND PARAGRAPH: BORROWER may repay the total amount of the Loan or any portion of it at any time before the Repayment Date, provided that (i) LENDER has agreed to such anticipated repayment in writing, and (ii) each such repayment shall be accompanied by the payment of accrued interest to the date of each repayment on the amount prepaid, provided that each partial repayment shall be in a principal amount equal to $1,000,000 or an integral multiple thereof. In the event of repayment of a portion of the Loan, the repayment of the outstanding balance will be subject to all the provisions set forth herein and the acceptance by LENDER of the repayment of any portion does not constitute a waiver to the repayment of the outstanding balance of the Loan. The repayment of the total amount of the Loan or any portion thereof is subject to a prior notification to the Brazilian Central Bank with at least 30 days in advance.

THIRD PARAGRAPH: Notwithstanding the provisions of this Clause Three, this Loan or any part thereof may be extended for such term as may be agreed upon the written consent of BORROWER and LENDER, subject to the prior approval of the Brazilian Central Bank, if applicable.

## CLAUSE FOUR

The payment of principal hereunder or the payment of any other amount due or that becomes due by the BORROWER hereunder shall be made free and clear of any taxes, levies, deductions, charges and withholdings of any nature imposed by Brazil or any of its political subdivisions ("Brazilian Taxes"). If Brazilian Taxes are required to be withheld or deducted from any such payment, the BORROWER shall pay immediately, for the account of the LENDER, such additional amount as may be necessary to ensure that the net amount actually received by the LENDER is equal to the amount which the LENDER would have received had no Brazilian Taxes been withheld or deducted from such payment.

FIRST PARAGRAPH: Whenever any Brazilian Tax is payable by the BORROWER, as promptly as possible thereafter the BORROWER shall send the LENDER an official receipt showing payment. The BORROWER will indemnify the LENDER and its affiliates for the full amount of Brazilian Taxes (including, any Brazilian Taxes on amounts payable to the LENDER under this paragraph) paid by the LENDER and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, upon written demand by the LENDER therefor.

SECOND PARAGRAPH: All payments made by the BORROWER under this Agreement will be made without setoff, counterclaim or other defense of any kind.

## CLAUSE FIVE

In the event the BORROWER (i) fails to punctually pay any amount due hereunder on the date such payment is due and payable; or (ii) any representation or warranty made by the BORROWER in this Agreement shall have been incorrect in any material respect when

made; or (iii) the BORROWER shall fail to perform or observe in any material respect any term, covenant or agreement contained in this Agreement to be performed or observed by it and, except as set forth in clause (i) above, such failure, if capable of being remedied, shall remain unremedied for thirty days after written notice thereof shall have been given to the BORROWER by the LENDER; or (iv) the BORROWER shall be generally not paying its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Person seeking to adjudicate the BORROWER as a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of the BORROWER or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief of the appointment of a receiver, trustee, custodian or other similar official for such person or for any substantial part of the BORROWER'S property; or (v) the BORROWER shall take any action to authorize or effect any of the actions set forth above in this clause (iv) (collectively, "Events of Default"); then anything herein before to the contrary notwithstanding, the totality of the principal and any and all other amounts due hereunder shall become immediately due and payable, without diligence, presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.

FIRST PARAGRAPH: In case an Event of Default has occurred and is continuing, the interest rate applicable to the Loan shall be increased by one percentage point (1%) per annum above the rate of interest applicable hereunder (the "Default Rate"), and all outstanding principal of the Loan shall bear interest at the Default Rate. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived by LENDER.

SECOND PARAGRAPH: Upon the occurrence of an Event of Default the LENDER shall have, in addition to any rights hereunder, all of the rights, powers and remedies provided at law or equity.

## CLAUSE SIX

FIRST PARAGRAPH: BORROWER hereby represents and warrants that:

(a)    The BORROWER is a sociedade anônima duly organized, validly existing and in good standing under the laws of Brazil and has all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted and to own and use its properties and to consummate the transactions contemplated by this Agreement, except for such as required to own and operate the assets subject to the PRJ Documents, each of which license, authorization, permit, consent and approval (to the extent material to the BORROWER) is listed on Schedule 1(a) of the Disclosure Schedules, attached hereto as Annex A (the "Disclosure Schedules").

(b)    The authorized capital stock of the BORROWER consists of 17,600,000 ON A Shares, 4,400,000 ON B Shares and 22,000,000 PN Shares all of which, are issued and outstanding and fully paid in as of the date hereof. All outstanding shares of capital stock of the BORROWER are duly authorized, validly issued, fully paid and non-assessable, are not subject to, nor were they issued in violation of, any preemptive rights, rights of first refusal or similar rights, and are held of record by the parties listed on Schedule 1(b) of the

10222949.7                                          5

Disclosure Schedules.

(c)     Except for the ON A Convertibles, the ON B Convertibles and the Preferred Debentures and shares to be issued as management incentives (the names of all the recipients thereof (to the extent currently known) and such number of shares as each such recipient shall receive (or, to the extent that such securities are unallocated, what the total amount of such unallocated securities is)) are set forth on Schedule 1(b) of the Disclosure Schedules, except as set forth on Schedule 1(b) of the Disclosure Schedules, there are no outstanding or authorized (i) securities of the BORROWER convertible into or exchangeable for shares of capital stock or voting securities of the BORROWER, or (ii) options or other rights to acquire from the BORROWER, or other obligation of the BORROWER to register, issue, or otherwise cause to become outstanding, any of its capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the BORROWER or (iii) stock appreciation, phantom stock, profit participation, or similar rights with respect to the BORROWER (the items in clauses (i) and (ii) being referred to collectively as "Borrower Securities"). Other than as set forth on Schedule 1(b) to the Disclosure Schedules, there are no (a) outstanding obligations of the BORROWER to repurchase, redeem, or otherwise acquire any Borrower Securities, or (b) voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of the BORROWER.

(d)     The BORROWER does not currently have and never has had any subsidiaries and does not own an equity interest in any person.

(e)     Except as otherwise expressly set forth on Schedule 1(e) of the Disclosure Schedules, the consummation of the transactions contemplated by this Agreement by the BORROWER requires no action by or in respect of, or filing with, any transnational, or domestic or foreign, federal, state, or local, governmental authority, department, court, agency or official, including any political subdivision thereof (a "Governmental Authority"), other than as would not have, individually or in the aggregate, a material adverse effect on the ability to consummate the transactions contemplated by this Agreement and the ability to receive all the benefits of such consummation.

(f)     The Edital is in full force and effect. None of the BORROWER or, to the knowledge of the BORROWER, any party to the Edital has repudiated any material provision of the Edital, or is in default or breach in any respect under the terms of the Edital. The Proposal is the most recent version of the Proposal and has not been amended.

(g)     Except as otherwise expressly contemplated and assuming the receipt of all consents and approvals (to the extent material to the BORROWER) contemplated by this Agreement and the PRJ Documents, each of which consents and approvals is set forth on Schedule 1(g) of the Disclosure Schedules, the consummation of the transactions contemplated by this Agreement do not and will not (i) violate the organizational documents of the BORROWER, (ii) violate any material federal, state, local or foreign law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, executive order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to the BORROWER (an "Applicable Law"), require any consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any material right or material obligation of the BORROWER or to a loss of any material benefit to which the BORROWER is entitled under any provision of any

agreement or other instrument binding upon the BORROWER, or (iii) result in the creation or imposition of any mortgage, lien, pledge, transfer restriction, option, claim, charge, security interest or encumbrance in respect of any property or asset of the BORROWER other than, in the case of clause (iii) above, as is not reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the BORROWER.

(h)     Other than as set forth on Schedule 1(h) of the Disclosure Schedules, there is no action, suit, injunction, order, judgment, decree or ruling pending against the BORROWER before any arbitrator or Governmental Authority, and, to the knowledge of BORROWER no such matter has been threatened against the BORROWER or its properties which is reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the BORROWER.

(i)     The BORROWER has not violated and is not in violation in any respect of any Applicable Law which violation is reasonably likely to have, individually or in the aggregate with any other violations, a material adverse effect on the business, financial condition or results of operation of the BORROWER. Other than as set forth on Schedule 1(h) of the Disclosure Schedules, the BORROWER has not received any notices or notifications from any Governmental Authority alleging that the BORROWER is not in compliance with any Applicable Laws.

(j)     Subject to the following sentence, the BORROWER has entered into a proposal respecting collective bargaining agreements or other similar arrangements (the "Union Agreements") with each labor union representing any of its employees, a copy of which has previously been provided to LENDER. Each of the Union Agreements remains to be ratified by the applicable labor unions party to such Union Agreement and will be in full force and effect upon such ratification. Other than as to the litigation matters disclosed in Schedule 1(h): (i) there are no unfair labor practice charges, grievances or complaints pending or, to the knowledge of the BORROWER, threatened in writing by or on behalf of any employee or group of employees of the BORROWER which are reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the BORROWER; and (ii) there are no complaints, charges, or claims against the BORROWER pending, or to the knowledge of BORROWER, threatened in writing to be brought or filed, with any authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment or any individual by the BORROWER which are reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the BORROWER. The BORROWER is in compliance with all laws governing the employment of labor, including, but not limited to, all such laws relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security taxes except to the extent that any non-compliance would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the BORROWER.

(k)     This Agreement will, when executed, constitute the valid and binding obligation of BORROWER, enforceable against BORROWER in accordance with its terms and conditions, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the

10222949.7                                          7

availability of equitable remedies.

SECOND PARAGRAPH: LENDER hereby represents and warrants that:

(a)    LENDER is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has all organizational powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted and to consummate the transactions contemplated by this Agreement.

(b)    The execution, delivery and performance by LENDER of this Agreement and the consummation of the transactions contemplated hereby are within LENDER'S powers and have been duly authorized by all necessary action on the part of LENDER. This Agreement will, when executed, constitute, the valid and binding obligation of LENDER, enforceable against LENDER in accordance with its terms and conditions, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies.

(c)    Except as otherwise expressly set forth on Schedule 2(c) of the Disclosure Schedules, the execution, delivery and performance by LENDER of this Agreement require no action by or in respect of, or filing with, any Governmental Authority, other than as would not have, individually or in the aggregate, a material adverse effect on the ability to consummate the transactions contemplated by this Agreement and the ability to receive all the benefits of such consummation.

(d)    Except as otherwise expressly contemplated and assuming the receipt of all consents and approvals contemplated by this Agreement and the PRJ Documents, each of which consents and approvals is set forth on Schedule 2(d) of the Disclosure Schedules, the consummation of the transactions contemplated by this Agreement do not and will not (i) violate the organizational documents of LENDER, (ii) violate any material Applicable Law, and (iii) conflict with, result in the breach of, constitute a default under, result in acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license, instrument, or other arrangement to which LENDER is a party or by which it is bound or to which any of its assets are subject, except to the extent it does not have an adverse effect on the ability of LENDER to effect the transactions contemplated by this Agreement.

(e)    Other than as set forth on Schedule 2(e) of the Disclosure Schedules, there are no actions, suits, proceedings or orders pending or, to LENDER'S knowledge, threatened against or affecting LENDER at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would materially adversely affect LENDER'S performance under this Agreement or the consummation of the transactions contemplated hereby.

## CLAUSE SEVEN

FIRST PARAGRAPH:    So long as any principal of or interest on the Loan shall remain unpaid, the BORROWER will, unless the LENDER shall otherwise consent in writing:

(a)     comply, and cause each of its subsidiaries to comply, in all material respects with all Applicable Laws, rules, regulations and orders, such compliance to include, without limitation, payment before the same become delinquent all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith or where failure to do so could not reasonably be expected to result in a Material Adverse Effect;

(b)     maintain and preserve its existence, rights and privileges that are necessary in the proper conduct of its business, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect;

(c)     keep adequate and proper records and books of account, in which complete and correct entries will be made in accordance with BORROWER'S accounting principles as in effect on the date hereof and as in effect from time to time, consistently applied, reflecting all material financial transactions of the BORROWER; and

(d)     permit, and cause each of its subsidiaries to permit, the agents and representatives of the LENDER at any time and from time to time during normal business hours, and, so long as no default or Event of Default shall have occurred and be continuing, upon reasonable prior notice, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and such Person's other assets, to conduct audits, physical counts, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives. In furtherance of the foregoing, BORROWER hereby authorizes its independent accountants, and the independent accountants of each of its subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the LENDER in accordance with this paragraph (d).

SECOND PARAGRAPH:  So long as any principal of or interest on the Loan shall remain unpaid, the BORROWER will not, and will not permit any subsidiary to, take any of the actions , unless the LENDER shall otherwise consent in writing:

(a)     merge or consolidate with any Person or entity, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(b)     sell, convey, transfer, lease or dispose of (whether in one transaction or in a series of transactions) all or any substantial part of its assets to any Person or entity, or abandon all or substantially all of its assets, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;;

(c)     (i) issue or sell, any equity securities of the BORROWER or any of its subsidiaries or any other securities (equity or debt) that are convertible into or exchangeable or surrenderable for equity securities of the BORROWER or any of its subsidiaries ("Capital Stock") or (ii) other than upon surrender or conversion or exchange as per their terms, repurchase, acquire, redeem or retire any such securities of the BORROWER or any of its subsidiaries, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type including provisions with respect to (x) immaterial-sized baskets for permitted amounts of Indebtedness and (y) equity issuances

in connection with management incentive plans;

(d)    other than interest accruals in accordance with the terms of convertible, exchangeable or surrenderable debt securities, the BORROWER may not declare, set aside, or pay any dividend or distribution in respect of any of its equity securities (or any securities convertible into or exchangeable or surrenderable for equity securities) or repurchase, redeem or otherwise acquire any such securities, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(e)    engage in any transactions or enter into any agreements or understandings with affiliates or related companies, including any transactions between the BORROWER and Varig Logistica S.A., at a price that is not fair market value for the goods or services which are the subject of such transaction.    Fair market value shall be determined by the independent members of the Board of Directors of the BORROWER or independent consultants they may designate;

(f)    (i) acquire any businesses, including by means of merger or consolidation with any other person, an acquisition of capital stock of another person, an acquisition of all or substantially all of the assets of another person or business of another person or any other transaction or series of transactions, (ii) divest itself of any businesses, by any such means or (iii) engage in any acquisition of any material, or sale of a material portion of the BORROWER's, assets, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(g)    make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock or any of its subsidiaries voting equity interests, or warrants, options or other rights for purchase thereof, now or hereafter outstanding, except in accordance with the terms of such voting equity interests issued in accordance with this Agreement, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type including provisions with respect to (i) immaterial-sized baskets for permitted amounts of Indebtedness and (ii) equity issuances in connection with management incentive plans;

(h)    except as set forth on _Annex B_ (i) incur, assume or guarantee any Indebtedness, or (ii) repay, redeem, defease or otherwise retire any Indebtedness of it or its subsidiaries, except for the Indebtedness under this Agreement and any other obligations owing to the LENDER, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type including provisions with respect to (x) to immaterial-sized baskets for permitted Indebtedness and (y) equity issuances in connection with management incentive plans;

(i)    amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would require any payment to be made earlier than the date originally scheduled on such Indebtedness, would increase the interest rate applicable to such Indebtedness, or would otherwise be adverse to LENDER; or

(j)      amend or modify, or permit the amendment or modification of, any provision of any aircraft capital or operating lease or other similar aircraft equipment financing agreement in any manner that is adverse in any material respect to the interests of the BORROWER or the LENDER, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type.

## CLAUSE EIGHT

No terms or provisions of this Agreement may be changed, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against which the enforcement of the change, waive, discharge or termination is sought, and then such change, waiver, discharge or termination shall be effective only in the specific instance and for the specific purpose for which given. No delay or failure on the part of LENDER or BORROWER to exercise any power or right hereunder shall operate as a waiver thereof, nor as acquiescence in any default, nor shall any single or partial exercise thereof by the LENDER preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy of the LENDER.

## CLAUSE NINE

This Agreement is irrevocable, binding both Parties, and their respective successors. The BORROWER shall not delegate any of its obligations under this Agreement without the prior written consent of the LENDER. The LENDER may assign its rights and obligations under this Agreement to any wholly owned affiliate of LENDER or any affiliate controlled by majority shareholding of LENDER without the prior written consent of the BORROWER, provided that such transfer shall have the prior approval of Agência Nacional de Aviação Civil ("ANAC"), if applicable, and shall not trigger any reporting requirements under the ANAC regulations.

## CLAUSE TEN

All notices or other communications provided for hereunder shall be in writing (including telecommunications) and shall be mailed, sent via facsimile or delivered to the address of the applicable Party set forth below, or to such Party at such other address as may hereafter be specified thereby to the other Party (at its address set forth herein) in writing. All notices and communications shall be effective (i) if mailed, when received or three days after mailing, whichever is earlier, (ii) if sent via facsimile, when transmitted and (iii) if delivered, upon delivery.

If to the BORROWER, to:
AÉREO TRANSPORTES AÉREOS S.A.
Rua Visconde de Inhaúma, 77,
10th floor, part
CEP 20091-007 Rio de Janeiro / RJ
Brazil
Attention: Jorge Marcio Gomes da Silva

10222949.7                                11

With a copy to:
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Facsimile: (2120 508-6101
Attention: Mark Palmer, Esq.

XAVIER, BERNARDES, BRAGANÇA
Av. Brasil, 1008 - Jardim América
01430-000 - São Paulo, SP - Brasil
Facsimile: 55-11 3069-4301
Attention: Regina Lynch

If to the LENDER, to:

CAT AEREA LLC
c/o Cerberus Capital Management, L.P.
299 Park Avenue
New York, New York 10171
Facsimile: (212) 758-5305
Attention: Scott Cohen

With a copy to:

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Facsimile: 212-593-5955
Attention: Adam Harris, Esq.

### CLAUSE ELEVEN

Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

### CLAUSE TWELVE

The BORROWER hereby agrees to pay on demand all reasonable costs and expenses (including, without limitation, all reasonable fees, expenses and other client charges of counsel to the LENDER) incurred by the LENDER in connection with the enforcement of the LENDER'S rights, and the collection of all amounts due, hereunder. The BORROWER agrees to indemnify and hold harmless the LENDER and each of its directors, officers, members, employees, agents, affiliates and advisors from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and other client charges of counsel) which may be incurred by or asserted against the LENDER or any such director, officer, employee, agent, affiliate or advisor in connection with or arising out of any



investigation, litigation or proceeding related to or arising out of this Agreement or any other related document or any transaction contemplated hereby or thereby (but in any case excluding any such claims, damages, losses, liabilities or expenses incurred solely by reason of the gross negligence or willful misconduct of the indemnitee). The obligations of the BORROWER under this clause shall survive the payment in full of the Loan and any interest thereon.

## CLAUSE THIRTEEN

This Agreement is executed in English language, and the English version hereof shall prevail in the event of conflict with any version in another language.

## CLAUSE FOURTEEN

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. The BORROWER hereby (i) irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in New York City in any action or proceeding arising out of or relating to this Agreement, (ii) waives any defense based on doctrines of venue or forum non conveniens, or similar rules or doctrines, and (iii) irrevocably agrees that all claims in respect of such an action or proceeding may be heard and determined in such New York State or Federal court. The BORROWER and the LENDER (by its acceptance hereof) mutually waive any right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement.

## CLAUSE FIFTEEN

Notwithstanding anything to the contrary contained herein, this Agreement is not intended to and does not serve to effect a novation of the obligations under the Existing Loan Agreement. Instead it is the express intention of the Parties to reaffirm the indebtedness created under the Existing Loan Agreement. The BORROWER acknowledges and confirms that the term "Loan" as used herein (or any other terms used herein to describe to refer to the indebtedness, liabilities and obligations of BORROWER to the LENDER) includes, without limitation, the indebtedness, liabilities and obligations of the BORROWER under the Existing Loan Agreement, all as amended and restated hereby, as the same may be further amended, modified, supplemented or restated from time to time. This Agreement and all agreements, instruments and documents executed or delivered in connection with any of the foregoing shall each be deemed to be amended in the extent necessary to give effect to the provisions of this Agreement. This Agreement sets forth the entire understanding of the BORROWER and LENDER with respect to the subject matter hereof.

In witness whereof, LENDER and BORROWER have each caused this agreement to be duly executed on the date below written, in three (3) counterparts of equal content, in the presence of two witnesses.

As of September 12, 2006

CAT AEREA LLC
Scott Cohen

AÉREO TRANSPORTES AÉREOS S.A.
(to be known as VRG LINHAS AEREAS S.A.)
Jorge Marcio Gomes da Silva

AÉREO TRANSPORTES AÉREOS S.A.
(to be known as VRG LINHAS AEREAS S.A.)
Edson Arruda de Faria e Albuquerque

ACKNOWLEDGED AND AGREED AS ASSIGNOR:

VOLO LOGISTICS LLC
Larry Teitelbaum

Witnesses:

1.
Name: RAFAEL MOERBECK DE ALMEIDA REGO
I.D.:
Passport: 009745168

2.
Name: PAULA SUCCOS DE CARVALHO
I.D.: 118.858 OABIRJ
Passport: CS 388858

In witness whereof, LENDER and BORROWER have each caused this agreement to be duly executed on the date below written, in three (3) counterparts of equal content, in the presence of two witnesses.

As of September 12, 2006

_____
CAT AEREA LLC
Scott Cohen


_____
AÉREO TRANSPORTES AÉREOS S.A.
(to be known as VRG LINHAS AEREAS S.A.)
Jorge Marcio Gomes da Silva


_____
AÉREO TRANSPORTES AÉREOS S.A.
(to be known as VRG LINHAS AEREAS S.A.)
Edson Arruda de Faria e Albuquerque


ACKNOWLEDGED AND AGREED AS ASSIGNOR:



_____
VOLO LOGISTICS LLC
Larry Teitelbaum

Witnesses:

1. _____
Name: Michael White
I.D.:
Passport:

2. _____
Name: Robert Gadigian
I.D:
Passport:

<u>Annex A</u>

<u>Disclosure Schedules</u>

## Annex B

1.  Those certain debentures to be issued by BORROWER to Class I creditors in the aggregate principal amount of R$ 50,000,000 pursuant to the terms of the PRJ and the Proposal, and having a maturity date of ten (10) years from the date of issue, convertible (at the option of the holders) into a maximum equity stake corresponding to 5% of the total capital stock of the BORROWER with a fixed annual remuneration equivalent to R$ 4,200,000 per year, paid monthly.

2.  Those certain debentures to be issued by BORROWER to Class II creditors in the aggregate principal amount of R$ 50,000,000 pursuant to the terms of the PRJ and the Proposal, and having a maturity date of ten (10) years from the date of issue, convertible (at the option of the holders) into a maximum equity stake corresponding to 5% of the total capital stock of the BORROWER with a fixed annual remuneration equivalent to R$ 4,200,000 per year, paid monthly.

3.  The issuance of such other Indebtedness and Capital Stock as may be contemplated by the PRJ Documents.

10223949.7