# EXHIBIT "6"

EXECUTION COPY

## LOAN AGREEMENT

By this private instrument of loan agreement (this "Loan Agreement"),

on the one side, hereinafter referred to as "LENDER",

**I- VOLO LOGISTICS LLC**, a limited liability company organized in accordance with the laws of the State of Delaware, USA, enrolled with the Brazilian General Registry of Corporate Taxpayers of the Ministry of Finance ("CNPJ/MF") under No. 82.691.49/0001-82, herein, represented in accordance with its by-laws;

and, on the other side, hereinafter referred to as "BORROWER", and together with LENDER, the "Parties", and

**II- VARIG LOGISTICA S.A.**, a corporation organized in accordance with the laws of Brasil, with head offices at Rua Fidencio Ramos, 223, 14° andar, Vila Olimpia, in the City and State of Sao Paulo, registered as a tax payer under CNPJ n° 04.066.143/0001-57, herein represented by its Officers, in accordance with its by-laws **Mr. Joao Luis Bernes de Sousa**, Brazilian citizen, divorced, bearer or Identity Card No. 09.081.811-3, issued by SSP/SP, and registered as taxpayer under CPF/MF No. 024.418.378-34 and **Mr. Edson Arruda de Faria e Albuquerque**, a Brazilian citizen, divorced, bearer of identity card RG No. 03.926.945-1 IFP/RJ and registered as taxpayer under CPF/MF No. 412.273.877-68;.

## DEFINITIONS

For purposes of this Loan Agreement the following terms shall have the meanings set forth:

*Business Day* means any day other than a Saturday, Sunday or other day on which commercial banks in New York City or Rio de Janeiro are authorized or required to close.

*COMPANY* means Aereo Transportes Aereos S.A. (to be known as VRG Linhas Aereas S.A.).

*Credit Commitment* means, with respect to LENDER, the commitment of LENDER to make Loans to the BORROWER in a principal amount not to exceed the Funding Limit, as such amount may be terminated or reduced from time to time in accordance with the terms of this Loan Agreement.

*Edital* shall mean that certain Edital - Boletim No. 127 da Comarca da Capital do Rio de Janeiro 8a. Vara Empresarial dated as of July 13, 2006, in the form published on July 14, 2006 in the Official Gazette.

EXECUTION COPY

*Event of Default* shall have the meaning set forth in Clause Six hereto.

*Funding Limit* means US$8,852,376.74 (Eight Million Two Hundred Fifty Two Thousand Three Hundred Seventy Six Dollars and Seventy Four Cents).

*Indebtedness* means (i) the principal, premium (if any), interest and related fees and expenses (if any) in respect of (A) indebtedness for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments, (ii) all obligations in respect of outstanding letters of credit, acceptances and similar obligations, (iii) that portion of obligations with respect to capital leases not entered into in the ordinary course of business and properly accounted for as a liability, (iv) any obligation owed for all or any part of the deferred purchase price of property or services except for trade liabilities incurred in the ordinary course of business in accordance with customary practices, and (v) a guaranty of any of the obligations described in clause (i) or (ii) of this definition.

*Loan* means a loan made by LENDER to BORROWER pursuant to Clause One hereto, in an amount not to exceed the LENDER'S Credit Commitment.

*Material Adverse Effect* means a material adverse effect on any of (i) the business, financial condition or results of operations of the COMPANY and its subsidiaries, (ii) the ability of BORROWER to perform in any material respect its obligations under this Loan Agreement, (iii) the legality, validity or enforceability of this Loan Agreement, or (iv) the rights and remedies of LENDER under this Loan Agreement.

*Person* means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

*Sale of the COMPANY* shall mean (a) the admission of any ON A Shares, ON B Shares or PN Shares, as legally permissible, to trading on any regulated investment exchange, (b) the sale of all or substantially all of the ON A Shares, ON B Shares or the loans made by the BORROWER to purchase ON A Shares and ON B Shares (other than a sale to a wholly-owned affiliate or an affiliate controlled through majority shareholdings), or (c) the disposal in one or more transactions of all or substantially all of the assets or operations owned by the COMPANY.

*Term* shall mean the period ending on July 20, 2011, provided that if a Sale of the COMPANY shall not have occurred prior to such date, the Term shall be automatically extended for successive one-year periods, subject to the terms and condition hereof.

## CLAUSE ONE

The LENDER agrees to make Loans to the BORROWER at any time and from time to time on and after the Effective Date (defined below) until the Repayment Date (defined below), in an aggregate principal amount not to exceed at any time its Credit Commitment, in accordance with the provisions of Law no 4.131/62 and the rules issued by the Brazilian Central Bank.

NEWYORK:7592 1

EXECUTION COPY

**FIRST PARAGRAPH:** The aggregate principal amount of Loans outstanding at any time to the BORROWER shall not exceed the LENDER'S Credit Commitment. The LENDER'S Credit Commitment shall automatically and permanently be reduced to zero on the Repayment Date. Any principal amount of the Loan which is repaid or prepaid may not be reborrowed.

**SECOND PARAGRAPH:** BORROWER shall give LENDER prior written notice substantially in the form of Exhibit A hereto (the "Notice of Borrowing"), not later than 12:00 noon (New York City time) on the date which is one (1) Business Day prior to the date of the proposed Loan (or such shorter period as LENDER is willing to accommodate from time to time). Such Notice of Borrowing shall be executed by an authorized officer and specify (i) the proposed borrowing date, which must be a Business Day, and (ii) the principal amount of the proposed borrowing.

**THIRD PARAGRAPH:** LENDER may act without liability upon the basis of written notice believed by LENDER in good faith to be from BORROWER. BORROWER hereby waives the right to dispute the LENDER'S record of the terms of any such Notice of Borrowing. The LENDER shall be entitled to rely conclusively on any officer's authority to request a Loan on behalf of the BORROWER until LENDER receives written notice to the contrary. The LENDER shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

## CLAUSE TWO

The repayment of the Loan shall be made by the BORROWER to the LENDER's account in lawful money of the United States in immediately available funds, no later than 11 a.m. local time at the place of payment, in accordance with instructions to be provided by the LENDER to the BORROWER specifically for this purpose, in accordance with the terms provided for in Clause Three below.

**FIRST PARAGRAPH:** In the event a payment hereunder is due on a day that is not a Business Day, it shall instead fall due on the next following Business Day, and such extension of time shall in such case be included in the computation of interest payable hereunder.

**SECOND PARAGRAPH:** Prior to the execution of this Loan Agreement, the BORROWER shall have carried out the specific registration in the RDE-ROF Module of the financial terms and conditions of this Loan in accordance with the terms of the Central Bank of Brazil's Circular 3,027, dated as of February 22, 2001, as amended.

## CLAUSE THREE

The total amount of the Loan will be repaid on the date that is the earlier to occur of (a) the expiration of the Term, and (b) the occurrence of a Sale of the COMPANY (any such date, the "Repayment Date"), to be remitted by the BORROWER to the LENDER in accordance with the legislation and the procedures in force, especially those established by the Brazilian Central

EXECUTION COPY

Bank, by means of deposit in, or wire transfer to, such bank account as shall be designated by LENDER to BORROWER in writing:

**FIRST PARAGRAPH:** The principal amount unpaid and outstanding hereunder shall bear interest from the date hereof until paid in full, at the fixed rate of one per cent (1%) per annum (the "Interest Rate"). Interest at such rate shall accrue and be calculated on the basis of the actual number of days elapsed in a year of 360 days, and shall be payable together with the amount of principal of the Loan.

**SECOND PARAGRAPH:** BORROWER may repay the total amount of the Loan or any portion of it at any time before the Repayment Date, provided that (i) LENDER has agreed to such anticipated repayment in writing, and (ii) each such repayment shall be accompanied by the payment of accrued interest to the date of each repayment on the amount prepaid, provided that each partial repayment shall be in a principal amount equal to $1,000,000 or an integral multiple thereof. In the event of repayment of a portion of the Loan, the repayment of the outstanding balance will be subject to all the provisions set forth herein and the acceptance by LENDER of the repayment of any portion does not constitute a waiver to the repayment of the outstanding balance of the Loan. The repayment of the total amount of the Loan or any portion thereof is subject to a prior notification to the Brazilian Central Bank with at least 30 days in advance.

**THIRD PARAGRAPH:** Notwithstanding the provisions of this Clause Three, this Loan or any part thereof may be extended for such term as may be agreed upon the written consent of BORROWER and LENDER, subject to the prior approval of the Brazilian Central Bank, if applicable.

### CLAUSE FOUR

The payment of principal hereunder or the payment of any other amount due or that becomes due by the BORROWER hereunder shall be made free and clear of any taxes, levies, deductions, charges and withholdings of any nature imposed by Brazil or any of its political subdivisions ("Brazilian Taxes"). If Brazilian Taxes are required to be withheld or deducted from any such payment, the BORROWER shall pay immediately, for the account of the LENDER, such additional amount as may be necessary to ensure that the net amount actually received by the LENDER is equal to the amount which the LENDER would have received had no Brazilian Taxes been withheld or deducted from such payment.

**FIRST PARAGRAPH:** Whenever any Brazilian Tax is payable by the BORROWER, as promptly as possible thereafter the BORROWER shall send the LENDER an official receipt showing payment. The BORROWER will indemnify the LENDER and its affiliates for the full amount of Brazilian Taxes (including, any Brazilian Taxes on amounts payable to the LENDER under this paragraph) paid by the LENDER and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, upon written demand by the LENDER therefor.

EXECUTION COPY

**SECOND PARAGRAPH:** All payments made by the BORROWER under this Loan Agreement will be made without setoff, counterclaim or other defense of any kind.

## CLAUSE FIVE

**FIRST PARAGRAPH:** This Loan Agreement shall become effective as of the Business Day (the "Effective Date") when each of the following conditions precedent shall have been satisfied, which BORROWER hereby certifies as of the date hereof:

(a)     Representations and Warranties; No Event of Default. The following statements shall be true and correct: (i) the representations and warranties contained in Clause Seven hereof on or prior to the date of such Loan are true and correct on and as of such date as though made on and as of such date, (ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date and (iii) the conditions set forth in this First Paragraph of Clause Five have been satisfied as of the date of such request.

(b)     Legality. The making of such Loan shall not contravene any law, rule or regulation applicable to the LENDER.

(c)     Delivery of Loan Agreement. The LENDER shall have received the Loan Agreement, duly executed by BORROWER.

**SECOND PARAGRAPH:** The obligation of LENDER to make any Loan pursuant to the terms of this Loan Agreement shall be subject to the fulfillment, in a manner satisfactory to the LENDER, of each of the following conditions precedent:

(a)     Representations and Warranties; No Event of Default. The following statements shall be true and correct, and the submission by the BORROWER to the LENDER of a Notice of Borrowing with respect to each such Loan and the BORROWER'S acceptance of the proceeds of such Loan shall each be deemed to be a representation and warranty by BORROWER on the date of such Loan disbursement that: (i) the representations and warranties contained in Clause Seven hereof on or prior to the date of such Loan are true and correct on and as of such date as though made on and as of such date (unless they speak of another date, in which case they shall be true and correct as of such other date), (ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date and (iii) the conditions set forth in this Clause Five have been satisfied as of the date of such request.

(b)     Notices. The LENDER shall have received a Notice of Borrowing pursuant to Clause One hereof.

(c)     Proceedings; Receipt of Documents. All proceedings in connection with the making of the Loans and the other transactions contemplated by this Loan Agreement and all documents

incidental hereto and thereto, shall be reasonably satisfactory to the LENDER and its counsel, and the LENDER and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the LENDER or its counsel may reasonably request.

(d)     Approvals.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any governmental authority or other Person required in connection with the making of the Loans shall be in full force and effect.

## CLAUSE SIX

In the event the BORROWER (i) fails to punctually pay any amount due hereunder on the date such payment is due and payable; or (ii) any representation or warranty made by the BORROWER in this Agreement shall have been incorrect in any material respect when made; or (iii) the BORROWER shall fail to perform or observe in any material respect any term, covenant or agreement contained in this Loan Agreement to be performed or observed by it and, except as set forth in clause (i) above, such failure, if capable of being remedied, shall remain unremedied for thirty days after written notice thereof shall have been given to the BORROWER by the LENDER; or (iv) the BORROWER or the COMPANY shall be generally not paying its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Person seeking to adjudicate the BORROWER or the COMPANY as a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of the BORROWER or the COMPANY or its or their debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief of the appointment of a receiver, trustee, custodian or other similar official for such person or for any substantial part of the BORROWER'S property; or (v) the BORROWER or the COMPANY shall take any action to authorize or effect any of the actions set forth above in this clause (iv); or (vi) the BORROWER shall fail to pay any principal of or interest or premium under the Amended and Restated Loan Agreement, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified therein, or any other default under the Amended and Restated Loan Agreement, shall occur and shall continue after the applicable grace period, if any, specified therein, if the effect of such default or event is to accelerate, or to permit the acceleration of or the maturity of the Indebtedness evidenced thereby, in each case, prior to the stated maturity thereof (collectively, "Events of Default"); then anything herein before to the contrary notwithstanding, the totality of the principal and any and all other amounts due hereunder shall become immediately due and payable, without diligence, presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.

**FIRST PARAGRAPH:** In case an Event of Default has occurred and is continuing, the interest rate applicable to the Loan shall be increased by one percentage point (1%) per annum above the rate of interest applicable hereunder (the "Default Rate"), and all outstanding principal of the Loan shall bear interest at the Default Rate. Interest at the Default Rate shall accrue from

EXECUTION COPY

the initial date of such Event of Default until that Event of Default is cured or waived by LENDER.

**SECOND PARAGRAPH**: Upon the occurrence of an Event of Default the LENDER shall have, in addition to any rights hereunder, all of the rights, powers and remedies provided at law or equity.

## CLAUSE SEVEN

**FIRST PARAGRAPH**: BORROWER hereby represents and warrants that:

(a)    The COMPANY is a sociedade anônima duly organized, validly existing and in good standing under the laws of Brazil and has all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted and to own and use its properties and to consummate the transactions contemplated by this Loan Agreement, except for such as required to own and operate the assets subject to the PRJ Documents, each of which license, authorization, permit, consent and approval (to the extent material to the COMPANY) is listed on Schedule 1(a) of the Disclosure Schedules, attached hereto as Annex A (the "Disclosure Schedules").

(b)    The authorized capital stock of the COMPANY consists of 122,958,198 ON A Shares, 30,739,549 ON B Shares and 153,697,746 PN Shares, all of which are issued and outstanding and fully paid in as of the date hereof. All outstanding shares of capital stock of the COMPANY are duly authorized, validly issued, fully paid and non-assessable, are not subject to, nor were they issued in violation of, any preemptive rights, rights of first refusal or similar rights, and are held of record by the parties listed on Schedule 1(b) of the Disclosure Schedules.

(c)    Except for the ON A Convertibles, the ON B Convertibles and the Preferred Debentures and shares to be issued as management incentives (the names of all the recipients thereof (to the extent currently known) and such number of shares as each such recipient shall receive (or, to the extent that such securities are unallocated, what the total amount of such unallocated securities is)) are set forth on Schedule 1(b) of the Disclosure Schedules, except as set forth on Schedule 1(b) of the Disclosure Schedules, there are no outstanding or authorized (i) securities of the COMPANY convertible into or exchangeable for shares of capital stock or voting securities of the COMPANY, or (ii) options or other rights to acquire from the COMPANY, or other obligation of the COMPANY to register, issue, or otherwise cause to become outstanding, any of its capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the COMPANY or (iii) stock appreciation, phantom stock, profit participation, or similar rights with respect to the COMPANY (the items in clauses (i) and (ii) being referred to collectively as the "Company Securities"). Other than as set forth on Schedule 1(b) to the Disclosure Schedules, there are no (a) outstanding obligations of the COMPANY to repurchase, redeem, or otherwise acquire any Borrower Securities, or (b) voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of the COMPANY.

NEWYORK\6592.1

EXECUTION COPY

(d)    The COMPANY is a direct or indirect subsidiary of the BORROWER. The COMPANY does not currently have and never has had any subsidiaries and does not own an equity interest in any person.

(e)    Except as otherwise expressly set forth on Schedule 1(e) of the Disclosure Schedules, the consummation of the transactions contemplated by this Loan Agreement by the BORROWER or the COMPANY requires no action by or in respect of, or filing with, any transnational, or domestic or foreign, federal, state, or local, governmental authority, department, court, agency or official, including any political subdivision thereof (a "Governmental Authority"), other than as would not have, individually or in the aggregate, a material adverse effect on the ability to consummate the transactions contemplated by this Loan Agreement and the ability to receive all the benefits of such consummation.

(f)    The Edital is in full force and effect. None of the COMPANY or, to the knowledge of the BORROWER, any party to the Edital has repudiated any material provision of the Edital, or is in default or breach in any respect under the terms of the Edital. The Proposal is the most recent version of the Proposal and has not been amended.

(g)    Except as otherwise expressly contemplated and assuming the receipt of all consents and approvals (to the extent material to the BORROWER or the COMPANY, as applicable) contemplated by this Loan Agreement and the PRJ Documents, each of which consents and approvals is set forth on Schedule 1(g) of the Disclosure Schedules, the consummation of the transactions contemplated by this Loan Agreement do not and will not (i) violate the organizational documents of the BORROWER or the COMPANY, (ii) violate any material federal, state, local or foreign law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, executive order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to the BORROWER or the COMPANY (an "Applicable Law"), require any consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any material right or material obligation of the BORROWER or the COMPANY or to a loss of any material benefit to which the BORROWER or the COMPANY is entitled under any provision of any agreement or other instrument binding upon the BORROWER or the COMPANY, or (iii) result in the creation or imposition of any mortgage, lien, pledge, transfer restriction, option, claim, charge, security interest or encumbrance in respect of any property or asset of the BORROWER or the COMPANY other than, in the case of clause (iii) above, as is not reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the BORROWER or the COMPANY.

(h)    Other than as set forth on Schedule 1(h) of the Disclosure Schedules, as of the date hereof there is no action, suit, injunction, order, judgment, decree or ruling pending against the COMPANY before any arbitrator or Governmental Authority, and, to the knowledge of the COMPANY no such matter has been threatened against the COMPANY or its properties which is reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the COMPANY.

EXECUTION COPY

(i)      The COMPANY has not violated and is not in violation in any respect of any Applicable Law which violation is reasonably likely to have, individually or in the aggregate with any other violations, a material adverse effect on the business, financial condition or results of operation of the COMPANY.  Other than as set forth on Schedule 1(i) of the Disclosure Schedules, as of the date hereof the COMPANY has not received any notices or notifications from any Governmental Authority alleging that the COMPANY is not in compliance with any Applicable Laws.

(j)      Subject to the following sentence, the COMPANY has entered into a proposal respecting collective bargaining agreements or other similar arrangements (the "Union Agreements") with each labor union representing any of its employees, a copy of which has previously been provided to LENDER. Each of the Union Agreements as of the date hereof remains to be ratified by the applicable labor unions party to such Union Agreement and will be in full force and effect upon such ratification. Other than as to the litigation matters disclosed in Schedule 1(h): as of the date hereof (i) there are no unfair labor practice charges, grievances or complaints pending or, to the knowledge of the COMPANY, threatened in writing by or on behalf of any employee or group of employees of the COMPANY which are reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the COMPANY; and (ii) there are no complaints, charges, or claims against the COMPANY pending, or to the knowledge of COMPANY, threatened in writing to be brought or filed, with any authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment or any individual by the COMPANY which are reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the COMPANY.  The COMPANY is in compliance with all laws governing the employment of labor, including, but not limited to, all such laws relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security taxes except to the extent that any non-compliance would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operation of the COMPANY.

(k)      This Loan Agreement will, when executed, constitute, the valid and binding obligation of BORROWER, enforceable against BORROWER in accordance with its terms and conditions, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies.

SECOND PARAGRAPH: LENDER hereby represents and warrants that:

(a)      LENDER is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has all organizational powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted and to consummate the transactions contemplated by this Loan Agreement.

EXECUTION COPY

(b)    The execution, delivery and performance by LENDER of this Loan Agreement and the consummation of the transactions contemplated hereby are within LENDER'S powers and have been duly authorized by all necessary action on the part of LENDER. This Loan Agreement will, when executed, constitute the valid and binding obligation of LENDER, enforceable against LENDER in accordance with its terms and conditions, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies.

(c)    Except as otherwise expressly set forth on Schedule 2(c) of the Disclosure Schedules, the execution, delivery and performance by LENDER of this Loan Agreement require no action by or in respect of, or filing with, any Governmental Authority, other than as would not have, individually or in the aggregate, a material adverse effect on the ability to consummate the transactions contemplated by this Loan Agreement and the ability to receive all the benefits of such consummation.

(d)    Except as otherwise expressly contemplated and assuming the receipt of all consents and approvals contemplated by this Loan Agreement and the PRJ Documents, each of which consents and approvals is set forth on Schedule 2(d) of the Disclosure Schedules, the consummation of the transactions contemplated by this Loan Agreement do not and will not (i) violate the organizational documents of LENDER, (ii) violate any material Applicable Law, and (iii) conflict with, result in the breach of, constitute a default under, result in acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license, instrument, or other arrangement to which LENDER is a party or by which it is bound or to which any of its assets are subject, except to the extent it does not have an adverse effect on the ability of LENDER to effect the transactions contemplated by this Loan Agreement.

(e)    Other than as set forth on Schedule 2(e) of the Disclosure Schedules, there are no actions, suits, proceedings or orders pending or, to LENDER'S knowledge, threatened against or affecting LENDER at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would materially adversely affect LENDER'S performance under this Loan Agreement or the consummation of the transactions contemplated hereby.

## CLAUSE EIGHT

**FIRST PARAGRAPH:**    So long as any principal of or interest on the Loan shall remain unpaid, the BORROWER agrees that, unless the LENDER shall otherwise consent in writing:

(a)    the COMPANY shall comply, and cause each of its subsidiaries to comply, in all material respects with all Applicable Laws, rules, regulations and orders, such compliance to include, without limitation, payment before the same become delinquent all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith or where failure to do so could not reasonably be expected to result in a Material Adverse Effect;

NEWYORK\7592.1

(b)     the COMPANY and the BORROWER shall maintain and preserve their existence, rights and privileges that are necessary in the proper conduct of their respective businesses, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect;

(c)     the COMPANY and the BORROWER shall keep adequate and proper records and books of account, in which complete and correct entries will be made in accordance with the accounting principles of the BORROWER and the COMPANY, as applicable, as in effect on the date hereof and as in effect from time to time, consistently applied, reflecting all material financial transactions of the BORROWER and the COMPANY, as applicable; and

(d)     the COMPANY shall permit, and cause each of its subsidiaries to permit, the agents and representatives of the LENDER at any time and from time to time during normal business hours, and, so long as no default or Event of Default shall have occurred and be continuing, upon reasonable prior notice, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and such Person's other assets, to conduct audits, physical counts, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.    In furtherance of the foregoing, BORROWER hereby authorizes the independent accountants of each of the Company and its subsidiaries, o discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the LENDER in accordance with this paragraph (d).

**SECOND PARAGRAPH:**  So long as any principal of or interest on the Loan shall remain unpaid, the BORROWER agrees that the COMPANY will not, and the Company will not permit any subsidiary of the Company to, take any of the following actions, unless the LENDER shall otherwise consent in writing:

(a)     merge or consolidate with any Person or entity, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(b)     sell, convey, transfer, lease or dispose of (whether in one transaction or in a series of transactions) all or any substantial part of its assets to any Person or entity, or abandon all or substantially all of its assets, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(c)     (i) issue or sell, any equity securities of the COMPANY or any of its subsidiaries or any other securities (equity or debt) that are convertible into or exchangeable or surrenderable for equity securities of the COMPANY or any of its subsidiaries ("Capital Stock") or (ii) other than upon surrender or conversion or exchange as per their terms, repurchase, acquire, redeem or retire any such securities of the COMPANY or any of its subsidiaries, provided however that LENDER and COMPANY agree to negotiate in good faith standard exceptions for transactions of this type including provisions with respect to (x) immaterial-sized baskets for permitted amounts of Indebtedness and (y) equity issuances in connection with management incentive plans;

EXECUTION COPY

(d)     other than interest accruals in accordance with the terms of convertible, exchangeable or surrenderable debt securities, the COMPANY may not declare, set aside, or pay any dividend or distribution in respect of any of its equity securities (or any securities convertible into or exchangeable or surrenderable for equity securities) or repurchase, redeem or otherwise acquire any such securities, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(e)     engage in any transactions or enter into any agreements or understandings with affiliates or related companies, including any transactions between the BORROWER and the COMPANY, at a price that is not fair market value for the goods or services which are the subject of such transaction. Fair market value shall be determined by the independent members of the Board of Directors of the COMPANY or independent consultants they may designate;

(f)     (i) acquire any businesses, including by means of merger or consolidation with any other person, an acquisition of capital stock of another person, an acquisition of all or substantially all of the assets of another person or business of another person or any other transaction or series of transactions, (ii) divest itself of any businesses, by any such means or (iii) engage in any acquisition of any material, or sale of a material portion of the the the COMPANY's, assets, provided that the written consent of LENDER shall not be unreasonably withheld or delayed;

(g)     make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock or any of its subsidiaries' voting equity interests, or warrants, options or other rights for purchase thereof, now or hereafter outstanding, except in accordance with the terms of such voting equity interests issued in accordance with this Loan Agreement, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type including provisions with respect to (i) immaterial-sized baskets for permitted amounts of Indebtedness and (ii) equity issuances in connection with management incentive plans;

(h)     except as set forth on Annex B, (i) incur, assume or guarantee any Indebtedness, or (ii) repay, redeem, defease or otherwise retire any Indebtedness of it or its subsidiaries, except for the Indebtedness under this Loan Agreement and any other obligations owing to the LENDER, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type including provisions with respect to (x) to immaterial-sized baskets for permitted Indebtedness and (y) equity issuances in connection with management incentive plans;

(i)     amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of the COMPANY's or its subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would require any payment to be made earlier than the date originally scheduled on such Indebtedness, would increase the interest rate applicable to such Indebtedness, or would otherwise be adverse to LENDER; or

EXECUTION COPY

(j)    amend or modify, or permit the amendment or modification of, any provision of any aircraft capital or operating lease or other similar aircraft equipment financing agreement in any manner that is adverse in any material respect to the interests of the COMPANY or the LENDER, provided however that LENDER and BORROWER agree to negotiate in good faith standard exceptions for transactions of this type.

### CLAUSE NINE

No terms or provisions of this Loan Agreement may be changed, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against which the enforcement of the change, waive, discharge or termination is sought, and then such change, waiver, discharge or termination shall be effective only in the specific instance and for the specific purpose for which given. No delay or failure on the part of LENDER or BORROWER to exercise any power or right hereunder shall operate as a waiver thereof, nor as acquiescence in any default, nor shall any single or partial exercise thereof by the LENDER preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy of the LENDER.

### CLAUSE TEN

This Loan Agreement is irrevocable, binding both Parties and their respective successors. The BORROWER shall not delegate any of its obligations under this Loan Agreement without the prior written consent of the LENDER. The LENDER may assign its rights and obligations under this Loan Agreement to any wholly-owned affiliate of LENDER or any affiliate controlled by majority shareholding of LENDER without the prior written consent of the BORROWER, provided that such transfer shall have the prior approval of Agência Nacional de Aviação Civil ("ANAC"), if applicable, and shall not trigger any reporting requirements under the ANAC regulations.

### CLAUSE ELEVEN

All notices or other communications provided for hereunder shall be in writing (including telecommunications) and shall be mailed, sent via facsimile or delivered to the address of the applicable Party set forth below, or to such Party at such other address as may hereafter be specified thereby to the other Party (at its address set forth herein) in writing. All notices and communications shall be effective (i) if mailed, when received or three days after mailing, whichever is earlier, (ii) if sent via facsimile, when transmitted and (iii) if delivered, upon delivery.

If to the BORROWER, to:

VARIG LOGISTICA S.A.
Rua Fidencio Ramos, 223,
14° andar, Vila Olimpia

NEWYORK:7592.1

EXECUTION COPY

Sao Paulo
Brazil
Attention: Joao Luis Bernes de Sousa


With a copy to:

BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Facsimile: (212) 508-6101
Attention: Mark Palmer, Esq.

XAVIER, BERNARDES, BRAGANÇA
Av. Brasil, 1008 - Jardim América
01430-000 - São Paulo, SP - Brasil
Facsimile: 55-11 3069-4301
Attention: Regina Lynch


If to the LENDER, to:

VOLO LOGISTICS LLC
520 Madison Avenue
New York, NY 10022-4213
Facsimile: (212) 651-4011
Attn: Lawrence M. Teitelbaum, Chief Financial Officer

With a copy to:

BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Facsimile: (212) 508-6101
Attention: Mark Palmer, Esq.

## CLAUSE TWELVE

Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

NEWYORK\7592.1

EXECUTION COPY

## CLAUSE THIRTEEN

The BORROWER hereby agrees to pay on demand all reasonable costs and expenses (including, without limitation, all reasonable fees, expenses and other client charges of counsel to the LENDER) incurred by the LENDER in connection with the enforcement of the LENDER'S rights, and the collection of all amounts due, hereunder. The BORROWER agrees to indemnify and hold harmless the LENDER and each of its directors, officers, members, employees, agents, affiliates and advisors from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and other client charges of counsel) which may be incurred by or asserted against the LENDER or any such director, officer, employee, agent, affiliate or advisor in connection with or arising out of any investigation, litigation or proceeding related to or arising out of this Loan Agreement or any other related document or any transaction contemplated hereby or thereby (but in any case excluding any such claims, damages, losses, liabilities or expenses incurred solely by reason of the gross negligence or willful misconduct of the indemnitee). The obligations of the BORROWER under this clause shall survive the payment in full of the Loan and any interest thereon.

## CLAUSE FOURTEEN

This Loan Agreement is executed in English language, and the English version hereof shall prevail in the event of conflict with any version in another language.

## CLAUSE FIFTEEN

**This Loan Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.** The BORROWER hereby (i) irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in New York City in any action or proceeding arising out of or relating to this Loan Agreement, (ii) waives any defense based on doctrines of venue or forum non conveniens, or similar rules or doctrines, and (iii) irrevocably agrees that all claims in respect of such an action or proceeding may be heard and determined in such New York State or Federal court. The BORROWER and the LENDER (by its acceptance hereof) mutually waive any right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Loan Agreement.

## CLAUSE SIXTEEN

This Loan Agreement sets forth the entire understanding of the BORROWER and LENDER with respect to the subject matter hereof.

EXECUTION COPY

In witness whereof, LENDER and BORROWER have each caused this Loan Agreement to be duly executed on the date below written, in two (2) counterparts of equal content, in the presence of two witnesses.

As of December 13, 2006

_____
VOLO LOGISTICS LLC

_____
VARIG LOGISTICA S.A.
Jpao Luis Bernes de Sousa

_____
VARIG LOGISTICA S.A.
Edson Arruda de Faria e Albuquerque


Witnesses:


1. _____
   Name:
   I.D.:
   Passport:


2. _____
   Name:
   I.D:
   Passport:


Volo Loan Agreement Signature Page

**Annex A**

**Disclosure Schedules**

## Schedule I(a)

-    Registration of the Company before the Trade Board of the State of Rio de Janeiro (NIRE 33.3.0027672-6);

-    Brazilian Taxpayer Roll of the Ministry of Finance (CNPJ/MF) under no. 07.575.651/0001-59;

-    State Taxpayers Number ("Inscrição Estadual") no. 78.133.236;

-    Local Taxpayers Number ("Inscrição Municipal") no.392.207-3;

-    Authorization for the legal functioning as provider of services of regular air transport of passenger, cargo and post mail – Decision no. 181, of September 25, 2006 of the Brazilian Civil Aviation Agency ("Agência Nacional de Aviação Civil").

[......]

### Schedule 1.(b)

Shareholders of the Company:

-   VARIG Logística S.A., a company incorporated and validly existing under the laws of Brazil, having its head offices at Rua Fidêncio Ramos, no. 223, 14th floor, Vila Olímpia, CEP 04.551-010, city and State of São Paulo, enrolled in the Brazilian Taxpayer Roll of the Ministry of Finance (CNPJ/MF) under no. 04.066.143/0001-57;

-   Volo do Brasil S.A., a company incorporated and validly existing under the laws of Brazil, having its head offices at Rua Visconde de Inhaúma, no. 77, 10th floor, part, city and State of Rio de Janeiro, enrolled in the Brazilian Taxpayer Roll of the Ministry of Finance (CNPJ/MF) under no. 07.574.036/0001-28.

Number of Shares held by each Shareholder:

-   VARIG Logística S.A. –122,958,198 ON A Shares; 29,202,572 ON B Shares; and 152,160,769 PN Shares;

-   Volo do Brasil S.A. –1,536,977 ON B Shares; and 1,536,977 PN Shares.

**Schedule 1(e)**

-        Registration or update of registration in the RDE-ROF Module of the terms and conditions of this Loan with Central Bank of Brazil[1]

---

[1] [The company is permitted to request registration of a financial operation ("ROF") in the RDE-ROF Module on the terms and conditions of this Loan with Central Bank of Brazil.]

## Schedule 1(g)

- Registration in the RDE-ROF Module on the terms and conditions of this Loan with Central Bank of Brazil[2];

- Concession for regular public air transport services, pursuant to articles 180, 181 and 183 of the Brazilian Aeronautical Code (Law No. 7.565 dated as of December 19, 1986) and Ordinance No. 536;

- Authorization to import aircraft issued by the Commission of Coordination of Air Transport (COTAC), when applicable;

- Registration of the company's aircraft at the Brazilian Aeronautical Registry (RAB);

- Certificate of Homologation of Air Transport Company (Certificado de Homologação de Empresa de Transporte Aéreo) ("CHETA");

- Post approval of Conselho Administrativo de Defesa Econômica - CADE (Brazilian anti-trust authority);

- Collective Bargaining Agreement foreseen in item 47 of the Plano de Recuperação Judicial of Varig S.A., Rio Sul Linhas Aéreas S.A. and Nordeste Linhas Aéreas S.A., approved by the creditors on July 17, 2006 ("Plano de Recuperação Judicial") and homologated by Court on July 18, 2006;

- Agreement to be executed among Varig S.A., Rio Sul Linhas Aéreas S.A., Nordeste Linhas Aéreas S.A. and the Company (collectively the "Reorganizing Companies") for the assignment or dismissal of the Reorganizing Companies' employees located abroad in accordance with item 48 of the Plano de Recuperação Judicial;

- Approval of Plano de Recuperação Judicial by the corporate bodies of the Reorganizing Companies (item 48 of the Plano de Recuperação Judicial).

---

[2] [The company is permitted to request registration of financial operation ("ROF") in the RDE-ROF Module on the terms and conditions of this Loan with Central Bank of Brazil.]

Schedule 1(h)

| No. | Issue | Description |
|-----|-------|-------------|
| 1. | Parties: | Labor Public Attorney vs. Aéreo Transportes Aéreos S.A., Varig Logística S/A and Volo do Brasil S/A |
| | Docket no.: | 01078-2006-033-01-00-0 |
| | Court: | 33rd Labor Court of Rio de Janeiro |
| | Status of Dispute: | The Judge handled a decision declaring that Aereo, Variglog and Volo shall assume Varig's labor obligations in the amount of R$ 244,457,839.12 and ordered the seizure of such value of the defendants' accounts. The defendants filed an ordinary appeal to the High Labor Court of Rio de Janeiro (TRT). Awaiting for the Court's decision. |
| | Date dispute started: | July 31, 2006 |
| | Nature of Dispute: | Civil class action, in which the plaintiff seeks: (i) the assignment of defendants' responsibility with respect to Varig's labor obligations; (ii) the condemnation of the defendants to pay the delayed and unpaid salaries and the severance pays, (iii) the enforcement of the obligation set forth in the union agreements regarding the hiring and dismissal of employees. |
| | Amount Claimed: | R$ 244,457,839.12 |
| | Any other material comments: | Although the Judge has ordered the seizure of the defendants' accounts, that order has been lifted by a decision handled by the Superior Court (STJ). |

| No. | Issue | Description |
|-----|-------|-------------|
| 2. | Parties: | Sindicato Nacional dos Aeronautas vs. Aéreo Transportes Aéreos S.A. and Varig Logística S/A |
| | Docket no.: | 1053-2006-033-01-00-7 |
| | Court: | 33rd Labor Court of Rio de Janeiro |
| | Status of Dispute: | The Judge handled a decision dismissing the claim. The plaintiff (Sindicato Nacional dos Aeronautas) filed an ordinary appeal to the High Labor Court of Rio de Janeiro (TRT). Awaiting for the Court's decision. |
| | Date dispute started: | August 2nd, 2006 |
| | Nature of Dispute: | Civil class action, in which the plaintiff seeks: (i) the assignment of defendants' responsibility with respect to Varig's labor obligations; (ii) the attachment of Varig's assets which were transferred to the defendants; (iii) the condemnation of the defendants to pay the delayed and unpaid salaries and the severance pays, (iv) the guarantee |

|   |   |   |
|---|---|---|
|   |   | of payment of all of the labor credits, pre and post petition. |
|   | Amount Claimed: | Claim dismissed |
|   | Any other material comments: | This suit was filed in connection with a previous injunction (docket no. 0120-2006-033-01-00-7), filed before the same Court, in which the plaintiff requested the seizure of the amount of US$ 75,000.00, that the defendants were required to deposit according to the Edital. The Reorganization Court of Rio de Janeiro affirmed that such seizure was impossible to be effected, once the referred amount was directed to the necessary investment in the productive unit. |

| No. | Issue | Description |
|---|---|---|
| 3. | Parties: | ACVAR – Associação de Comissários da Varig and other employee's associations vs. Aéreo Transportes Aéreos S.A., Volo do Brasil S/A and Varig Logística S/A |
|   | Docket no.: | 01065-2006-033-01-00-1 |
|   | Court: | 33rd Labor Court of Rio de Janeiro |
|   | Status of Dispute: | The Judge handled a decision declaring that Aereo, Variglog and Volo shall assume Varig's labor obligations in the amount of R$ 244,457,839.12 and ordered the seizure of such value of the defendants' accounts. The defendants filed an ordinary appeal to the High Labor Court of Rio de Janeiro (TRT). Awaiting for the Court's decision. |
|   | Date dispute started: | August 4th, 2006 |
|   | Nature of Dispute: | Civil class action, in which the plaintiff seeks: (i) the assignment of defendants' responsibility with respect to Varig's labor obligations; (ii) the condemnation of the defendants to pay the delayed and unpaid salaries and the severance pays; and (iii) the enforcement of the obligation set forth in the union agreements regarding the hiring and dismissal of pilots ("aeronautas"). |
|   | Amount Claimed: | See item 1 above. |
|   | Any other material comments: | Although the Judge has ordered the seizure of the defendants' accounts, that order has been lifted by a decision handled by the Superior Court (STJ). |

| No. | Issue | Description |
|---|---|---|
| 5. | Parties: | Élnio Borges Malheiros vs. Aéreo Transportes Aéreos S.A., Varig Logística S/A and Volo do Brasil S/A |
|   | Docket no.: | 01173-2006-040-01-00-2 |
|   | Court: | 40th Labor Court of Rio de Janeiro |

| | | |
|---|---|---|
| Status of Dispute: | First Hearing held on September 12th, 2006. Awaiting for the Judge's decision to be handled on October 26th, 2006. |
| Date dispute started: | August 24th, 2006 |
| Nature of Dispute: | Claim filed by the plaintiff seeking for: (i) the assignment of defendants' responsibility with respect to Varig's labor obligations; (ii) the condemnation of the defendants to pay the delayed and unpaid salaries and the severance pays; and (iii) the condemnation of the defendants to pay an amount equivalent to 500 minimum wages for the emotional distress caused to the plaintiff. |
| Amount Claimed: | Unforeseeable. |
| Any other material comments: | The plaintiff asked an injunction to seizure the amount of R$ 73,515.33 of the defendants' accounts. |

| No. | Issue | Description |
|---|---|---|
| 6. | Parties: | Leonardo Bernardo Neto vs. Varig S/A, Aéreo Transportes Aéreos S.A., Varig Logística S/A, Volo do Brasil S/A, Marco Antonio Audi, Marcos Michel Haftel and Luiz Eduardo Gallo. |
| | Docket no.: | 01996200631102001 |
| | Court: | 1st Labor Court of Guarulhos |
| | Status of Dispute: | First Hearing held on September 26th, 2006. The Judge handled a decision excluding Marco Antonio Audi, Marcos Michel Haftel and Luiz Eduardo Gallo from the claim and declaring his judicial impediment to decide on the merit of the labor claim. Awaiting for the Judge to set a new date for the Hearing. |
| | Date dispute started: | August 22th, 2006 |
| | Nature of Dispute: | Claim filed by the plaintiff seeking for: (i) the assignment of defendants' responsibility with respect to Varig's labor obligations; (ii) the condemnation of the defendants to pay the delayed and unpaid salaries and the severance pays; and (iii) the condemnation of the defendants to pay an amount equivalent to 100 salaries (considering the amount of plaintiff's last salary) for the emotional distress caused to the plaintiff. |
| | Amount Claimed: | R$ 6,082,842.52 |
| | Any other material comments: | The plaintiff asked an injunction to receive immediately the FGTS's amounts. |

In addition to the foregoing disclosures, the Company is aware of and hereby discloses the following proceedings filed against the Company that have been "appended" to the 33rd Labor Court of Rio de Janeiro:

01281 2006-018 01 00 4
01218 2006 019 01 00 4
01173 2006 040 01 00 2
01117 2006 042 01 00 0
01202 2006 055 01 00 5
01157 2006 072 01 00 4

It is also of our knowledge the existence of approximately 190 (one hundred and ninety) lawsuits presently in course before the majority of the Brazilian States, filed by Varig's employees and former-employees against Varig Logística S.A., Volo do Brasil S.A. or Aereo Transportes Aereos S.A., or against the 3 (three) entities, claiming for severance pays, overtime, vacation, delayed salaries, among others. The majority of the plaintiffs seek for the assignment of defendants' responsibility with respect to Varig's labor obligations.

| No. | Issue | Description |
|-----|-------|-------------|
| 7. | Parties: | Docas Investimentos S/A vs. Volo do Brasil S.A. |
|  | Docket no.: | 2006.51.01.001382-9 |
|  | Court: | 7th Federal Court |
|  | Status of Dispute: | Awaiting Judge's decision on the merits. |
|  | Date dispute started: | January 27, 2006. |
|  | Nature of Dispute: | Injunction to avoid the homologation of the transference of Varig Logística's control to Volo do Brasil S/A. |
|  | Amount Claimed: | Unforeseeable. |
|  | Any other material comments: | The injunction was granted by the trial level Court and after dismissed by the Federal High Court. |

| No. | Issue | Description |
|-----|-------|-------------|
| 8. | Parties: | Docas Investimentos S/A vs. Volo do Brasil S.A. |
|  | Docket no.: | 2006.51.01.008507-5 |
|  | Court: | 7th Federal Court |
|  | Status of Dispute: | Awaiting Judge's decision on the merits. |
|  | Date dispute started: | August 9, 2006. |
|  | Nature of Dispute: | Suit filed in connection with the abovementioned injunction, in which the plaintiff is seeking the annulment of the homologation of the transference of Varig Logística's control to Volo do Brasil S/A. |
|  | Amount Claimed: | Unforeseeable. |
|  | Any other material comments: |  |

There are 26 consumer lawsuits filed against VARIGLOG and/or AÉREO TRANSPORTES AÉREOS and/or VOLO DO BRASIL.

Most of them are related to transportation services to be performed ("transportes a executar") and are in course before the Small Claim Courts, what limits the possible loss to R$ 14,000.00.

Thus far, only one lawsuit has been judged by the trial level Court. The Court dismissed the lawsuit against VARIGLOG, recognizing its illegitimacy as defendant since it is not liable for VARIG's obligations.

VARIG, which is also a defendant in most of the referred lawsuits, has entered into 3 settlements, regarding 3 of the 26 above mentioned lawsuits.

Finally, one of the lawsuit is a collective action filed by a consumer's protection association in the Federal Court of Minas Gerais, in which it is claimed that the right for compensation of all consumers must be observed.

**Schedule 1(i)**

Routine notices and notifications issued in the normal course of proceedings related to the fulfillment of Governmental Authorizations requirements.

Schedule 2(c)

Schedule 2(d)

See Schedule 1(g)

Schedule 2(e)

## Annex B

1.  Those certain debentures to be issued by the COMPANY to Class I creditors in the aggregate principal amount of R$ 50,000,000 pursuant to the terms of the PRJ and the Proposal, and having a maturity date of ten (10) years from the date of issue, convertible (at the option of the holders) into a maximum equity stake corresponding to 5% of the total capital stock of the COMPANY with a fixed annual remuneration equivalent to R$ 4,200,000 per year, paid monthly.

2.  Those certain debentures to be issued by the COMPANY to Class II creditors in the aggregate principal amount of R$ 50,000,000 pursuant to the terms of the PRJ and the Proposal, and having a maturity date of ten (10) years from the date of issue, convertible (at the option of the holders) into a maximum equity stake corresponding to 5% of the total capital stock of the COMPANY with a fixed annual remuneration equivalent to R$ 4,200,000 per year, paid monthly.

3.  The issuance of such other Indebtedness and Capital Stock as may be contemplated by the PRJ Documents.

<u>EXHIBIT A</u>

FORM OF NOTICE OF BORROWING

_____ ____, 2006

VOLO LOGISTICS LLC
520 Madison Avenue
New York, NY 10022-4213
Facsimile: (212) 651-4011
Attn:  Lawrence M. Teitelbaum, Chief Financial Officer

Ladies and Gentlemen:

        The undersigned, VARIG LOGISTICA S.A., a corporation organized under the laws of Brasil (the *"BORROWER"*), refers to the Loan Agreement, dated as of December 12, 2006 (such agreement, as amended, restated, supplemented or otherwise modified from time to time, being hereinafter referred to as the "Loan Agreement"; the terms defined therein being used herein as therein defined), by and between the BORROWER and VOLO LOGISTICS LLC, a Delaware limited liability company, as lender (the *"LENDER"*), and hereby gives you notice pursuant to Clause One of the Loan Agreement that the undersigned hereby requests a Loan under the Loan Agreement, and in connection with such request sets forth below the information relating to such Loan (the *"PROPOSED LOAN"*) as required by Clause One of the Loan Agreement.

       (i)     The borrowing date of the Proposed Loan is December ___, 2006.

       (ii)    The aggregate principal amount of the Proposed Loan is $_____.

        The undersigned hereby certifies that (i) the representations and warranties contained in Clause Seven of the Loan Agreement and in each other certificate or other writing delivered to LENDER pursuant thereto are true and correct on and as of the date first above written, (ii) no default or Event of Default has occurred or is continuing or will result from the making of the Proposed Loan or will occur or will be continuing on the date of the Proposed Loan, and (iii) all applicable conditions set forth in Clause Five of the Loan Agreement have been satisfied as of the date hereof or will be satisfied before the making of the Proposed Loan.

                                  Very truly yours,

                                    VARIG LOGISTICA S.A.,
                                    as Borrower

                                    _____

                                    Name:
                                    Title:

                                    _____

                                    Name:
                                    Title:

NOTICE OF BORROWING

December 13, 2006

VOLO LOGISTICS LLC
520 Madison Avenue
New York, NY 10022-4213
Facsimile: (212) 651-4011
Attn: Lawrence M. Teitelbaum, Chief Financial Officer

Ladies and Gentlemen:

        The undersigned, VARIG LOGISTICA S.A., a corporation organized under the laws of Brasil (the *"BORROWER"*), refers to the Loan Agreement, dated as of December 13, 2006 (such agreement, as amended, restated, supplemented or otherwise modified from time to time, being hereinafter referred to as the "Loan Agreement"; the terms defined therein being used herein as therein defined), by and between the BORROWER and VOLO LOGISTICS LLC, a Delaware limited liability company, as lender (the *"LENDER"*), and hereby gives you notice pursuant to Clause One of the Loan Agreement that the undersigned hereby requests a Loan under the Loan Agreement, and in connection with such request sets forth below the information relating to such Loan (the *"PROPOSED LOAN"*) as required by Clause One of the Loan Agreement.

       (i)     The borrowing date of the Proposed Loan is December 13, 2006.

       (ii)    The aggregate principal amount of the Proposed Loan is $8,852,376.74.

        The undersigned hereby certifies that (i) the representations and warranties contained in Clause Seven of the Loan Agreement and in each other certificate or other writing delivered to LENDER pursuant thereto are true and correct on and as of the date first above written, (ii) no default or Event of Default has occurred or is continuing or will result from the making of the Proposed Loan or will occur or will be continuing on the date of the Proposed Loan, and (iii) all applicable conditions set forth in Clause Five of the Loan Agreement have been satisfied as of the date hereof or will be satisfied before the making of the Proposed Loan.

Very truly yours,

VARIG LOGISTICA S.A.,
as Borrower

_____
Name:
Title:

_____
Name:
Title: